**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**PIKEVILLE**

**CRIMINAL ACTION NO. 7:22-CR-00007-REW-EBA**

**UNITED STATES OF AMERICA**                                      **PLAINTIFF**

**V.**          <u>**GOVERNMENT'S MEMORANDUM ON UNRESOLVED**</u>
         <u>**OBJECTIONS TO PRESENTENCE REPORT AND SENTENCING**</u>

**CRYSTAL COMPTON, D.O.**
**KAYLA LAMBERT**                                              **DEFENDANTS**

*************

Sentencing in this matter is scheduled for February 21, 2024.  The Defendants, Crystal Compton and Kayla Lambert, have objected to portions of the United States Probation Office's ("USPO") Presentence Investigative Reports ("PSR").  The United States sets forth its position on those objections to the PSR below.  Additionally, the United States outlines its position on the appropriate sentence for each Defendant under the United States Sentencing Guidelines ("U.S.S.G.") and 18 U.S.C. § 3553(a).

<u>**BACKGROUND**</u>

The grand jury returned an indictment on April 28, 2022, charging Compton and Lambert with several violations of the Controlled Substances Act, including, among other charges, (1) conspiring to use the DEA registration of another in violation of 21 U.S.C. § 846 (Count 1); (2) conspiring to unlawfully dispense controlled substances in violation of 21 U.S.C. § 846 (Count 6); and (3) with respect to Compton, unlawfully dispensing

1

controlled substances pursuant to prescriptions that were not issued in the usual course of professional practice for a legitimate medical purpose in violation of 21 U.S.C. §841(a)(1) (Counts 7-50).    [R. 1: Indictment.]    The charges arose from Compton's tenure as a physician in the Pikeville area, during which Compton was associated with several medical practices.  [*Id*. at ¶¶ 22-25.]

The case proceeded to trial beginning on September 13, 2023. [R. 130: Minute Entry.]  The United States introduced evidence and testimony from 18 witnesses, including employees of Compton's former clinic, DEA Diversion Investigator Morgan Freeman, several of Compton's former patients, Dr. Martin Eason, an experienced pain management and addiction medicine physician who reviewed a collection of Compton's medical records, and Dr. Neeraj Mahboob, an experienced internal medicine physician who reviewed a collection of Compton's records for the Kentucky Board of Medical Licensure ("KBML").  [*See* R. 140: Exhibit and Witness List.]  After the close of the Government's case, the defense elected to present evidence, calling a number of witnesses to testify, including Compton herself.  *Id*.

After presiding over the trial, the Court is very familiar with the proof in the record. To briefly summarize, the trial evidence—which largely focused on prescriptions issued to 17 putative patients, including Lambert—demonstrated that Compton and Lambert conspired to repeatedly distribute controlled substances through unauthorized prescriptions.  Dr. Eason and Dr. Mahboob offered detailed testimony based on their review of patient files and prescription data, explaining how the prescriptions issued to each of the patients whose files they reviewed deviated from accepted medical standards.

2

As Dr. Eason, Dr. Mahboob, and Diversion Investigator Freeman explained to the jury, many of Compton's prescriptions were for exceptionally high dosages and in problematic combinations with other drugs, especially for an internal medicine physician. As one reference point, the KBML's "Professional standards for prescribing and dispensing controlled substances" consider daily dosages at or above 50 morphine milligram equivalents ("MME") to be a "high-risk regimen." 201 K.A.R. 9:260 § 5(k)2.d. At their highest point, Compton's prescriptions to 15 of the patients significantly exceeded this range, with 12 of the patients' prescriptions exceeding 200 MME daily. [*See* Gov. Ex. 500.] Two patients' prescriptions approached or exceeded 1000 MME daily. [*See id*.]

Compton's medical records were grossly inadequate and often failed to provide a rationale for opioid pain medications. [*See* Gov. Ex. 100-118.] The records also revealed a number of other red flags and anomalies, such as failed urine drug tests, office visit dates which did not match prescription dates, early prescriptions, unexplained dose increases, and aberrant patient behavior. The medical records (and other trial evidence) also indicated that Compton went long intervals without seeing certain patients, even when dangerous opioids or other controlled substances were initiated or changed during those intervals. [*See* Gov. Ex. 501.] Further, many of the patients at issue had a personal connection with Compton. Some appeared to receive special treatment, such as Lambert herself or patient B.C., neither of whom had a drug test documented in their records. [*See* Gov. Ex. 104.]

The trial evidence also confirmed that Lambert regularly accompanied Compton at the practice and that she played an integral role in Compton's interactions with patients and the issuance of Compton's controlled substance prescriptions. Some witnesses

3

testified to Lambert's direct role in providing them prescriptions and that some patients and employees felt they had to "go through Lambert" in order to speak with Compton. Indeed, in some instances, Lambert, not Compton, signed Compton's signature on Compton's controlled substance prescriptions, which Dr. Eason (and Compton herself) testified was an unauthorized and unacceptable medical practice.   [R. 191: Crystal Compton TR (Trial) at Page ID# 1934.]

After considering the evidence, the jury convicted Compton on Counts 1, 6 and Counts 7-50; the jury convicted Lambert on Counts 1 and 6.   [R. 138: Minute Entry; R. 144: Jury Verdict.]

## ANALYSIS

## I.   UNRESOLVED OBJECTIONS TO THE PSR

The advisory Sentencing Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis.   *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted).   As such, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. King*, 553 Fed. Appx. 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

In calculating the appropriate Guidelines range, the Court considers as relevant conduct (1) "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and (2) "in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were . . .  (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal

4

activity, and (iii) reasonably foreseeable in connection with that criminal activity[.]" Relevant conduct is defined to include "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).  Relevant conduct may include "'uncharged crimes, crimes where charges have been dismissed, and crimes for which the defendant has been acquitted.'" *United States v. Rios*, 830 F.3d 403, 440 (6th Cir. 2016) (citing *United States v. Redmond*, 667 F.3d 863, 875 (7th Cir. 2012).

Although the initial "burden is on the government to prove, by a preponderance of the evidence, that a particular sentencing enhancement applies," *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003), "[w]hen a defendant fails to produce any evidence to contradict the facts set forth in the PSR, a district court is entitled to rely on those facts when sentencing the defendant." *United States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2007).[1]

Here, Compton and Lambert challenge the following portions of the PSR that impact their advisory Guidelines ranges: (1) the drug quantity calculation under U.S.S.G. § 2D1.1; (2) the imposition of a two-level enhancement to Compton's advisory range under U.S.S.G. § 3C1.1 for obstruction of justice based on her trial testimony; (3) a two-point enhancement to Lambert's advisory ranges under U.S.S.G. § 3B1.3 for abuse of a position

---

[1] "A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a bare denial, he must produce some evidence that calls the reliability or correctness of the alleged facts into question. If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. But the defendant gets no free ride: he must produce more than a bare denial, or the judge may rely entirely on the PSR." *United States v. Lang*, 333 F.3d 678 (6th Cir. 2003).

of trust or special skill; (4) a two-level enhancement for maintaining a drug-involved premises under U.S.S.G. §2D1.1(b)(12); and (5) the omission of a four-level reduction to Lambert's offense level under U.S.S.G. § 3B1.2.  The United States sets forth below its position on each enhancement.

### A.      The PSR Properly Calculates a Conservative Drug Quantity

"The Sentencing Guidelines instruct sentencing courts to calculate a defendant's base offense level from the total quantity of drugs attributable to [her]." *United States v. Thompson*, 588 F. App'x 449, 452 (6th Cir. 2014) (citing U.S.S.G. § 2D1.1(c)). "A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice so long as it errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008); *see also United States v. Huffman*, 529 F. App'x. 426, 428–29 (6th Cir. 2013) ("A district court is allowed to estimate the quantity so long as the court can conclude that it is more likely than not that the defendant is actually responsible for an amount greater than or equal to the amount for which she is held legally responsible.").

Given this lenient standard, the Sixth Circuit has upheld drug quantity calculations based on a variety of methodologies.  *See*, *e.g.*, *United States v. Fabode*, 2022 WL 16825408, at *5 (6th Cir. Nov. 8, 2022) (trial court's drug quantity calculations were not erroneous where the "trial testimony could easily lead a reasonable sentencing judge to believe that more than 40% of the Oxycodone and Oxymorphone pills sold by Fabode were sold illegally"); *United States v. Gowder*, 841 Fed. App'x. 770, 784 (6th Cir. 2020) (no error where "the district court could reasonably have held Gowder responsible for all

6

foreseeable drug prescriptions from TPI, as it found that all of TPI's prescriptions were part of the distribution conspiracy in which Gowder knowingly participated" but the Court reasonably "based its sentencing calculation on a more modest 25% of the total prescriptions, noting that that quantity sufficed to reach the highest-base-offense level for drug quantity"); *United States v. Rodriguez-Iznaga*, 575 Fed. App'x. 583, 586 (6th Cir. 2014) (trial court's calculations were properly based on percentage of prescriptions written to all Kentucky, Ohio, and West Virginia patients even though the trial court did not engage in a patient-by-patient analysis of the prescriptions). Indeed, "[s]o long as there is some minimum indicium of reliability beyond mere allegation to support the district court's calculation, [the Sixth Circuit] generally defer[s] to the drug weight approximated by the finder of fact." *Fabode*, 2022 WL 16825408 at *5 (citing *United States v. Ward*, 68 F.3d 146, 149 (6th Cir. 1995)).

Here, as noted, the trial evidence largely focused on prescriptions issued to 17 patients. The drug quantity calculations in the PSR are based on the prescriptions issued to those 17 patients. The trial evidence more than sufficiently establishes that each of the prescriptions issued to those 17 patients is properly included in calculating the drug quantity under U.S.S.G. § 2D1.1. For instance, Dr. Eason and Dr. Mahboob considered Compton's entire treatment history for each of the patients they reviewed and offered detailed explanations of how Compton's prescribing repeatedly deviated from accepted medical practices. Additionally, Diversion Investigator Freeman testified to the patients' prescription histories after their tenures as Compton's patients, which reinforces how significantly Compton's prescribing differed from other physicians. Seven of the patients

7

transitioned to buprenorphine (a medication prescribed for opioid use disorder) and five of the patients appeared to stop receiving opioids altogether.  The remainder were weaned to significantly lower dosages. None of the patients received dosages close to those Compton prescribed after Compton ceased prescribing to them.  Although difficult to succinctly summarize here, the other trial evidence, including employee and patient testimony, reinforced that each of the prescriptions issued to the 17 patients fell outside the usual course of professional practice and should be included in the Court's drug quantity calculations under U.S.S.G. § 2D1.1.

In her sentencing memorandum, Compton[2] seems to argue that the Court should not include all 17 patients in its calculations because "[t]here were 13[3] patients who testified that they were taking their medications as prescribed to them after legitimate consultations with Dr. Compton." [R. 192: Sentencing Memo. at 13.] Lambert's response to the PSR lodges a similar objection.  [K. Lambert PSR at 20 (letter from defense counsel arguing that "[t]he number [of pills] testified to was the total number prescribed. All witnesses testified that some of their prescriptions were given after a thorough exam and diagnostic testing.").]  But the patients' testimony does not undermine the broader proof regarding Compton's improper practices.  Indeed, many of the patients' testimony (especially on cross-examination) confirmed the concerns about Compton's prescribing.  As just several

---

[2] Compton and Lambert do not appear to contest that the converted drug weights for each patient are properly tabulated in the PSR.

[3] The United States believes that Compton called 10 (not 13) of the 17 patients who are included in the drug quantity calculations to testify at trial.  [*See* R. 140: Exhibit and Witness List.]

examples, patient K.B. did not seem to know why or when she took certain drugs Compton prescribed; patient B.C. testified inconsistently with his prior recorded interview regarding whether he took all of the pills Compton prescribed and also confirmed that Compton never drug tested him; patient B.G.R., who is Compton's cousin and father of patient B.R.R., indicated that he was dismissed by another physician for an inconsistent pill count and denied that he spent time around Compton's office in the way former employees described in their testimony; and patient A.S.'s arrest history indicated she allegedly smuggled controlled substances into a local jail just months before Compton issued the prescription identified in Count 50 of the Indictment.

Additionally, to the extent that Lambert also argues that the Court should not attribute the total drug weight to her because (1) she was not the prescribing physician; or (2) she was not present at the practice every day during the charged conspiracy, those arguments fail.  As the PSR correctly notes, Lambert's relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B) includes all acts and omissions of Compton's that were within the scope of their jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with the criminal activity. *See United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002) (noting that the Court must make "particularized findings with respect to both the scope of the defendant's agreement and the foreseeability of [her] co-conspirators' conduct.").  The trial evidence conclusively showed that Lambert worked closely with Compton and was instrumental in her prescribing from 2015 until Compton ceased practicing in 2019, even issuing the prescriptions herself at times.  The full scope of the prescribing at issue was within the

scope of Lambert's agreement with Compton and readily foreseeable to her.  Thus, the Court has a sufficient record to conclude that the full pill quantity should also be attributed to Lambert.

Further, the problematic prescriptions almost certainly extended beyond the 17 patients included in the PSR's drug quantity calculations.  For instance, Dr. Mahboob's review for the KBML included other patients who are not among the 17 in the PSR's calculations. Additionally, Compton admitted in her testimony to prescribing to a number of other relatives or employees. [R. 191: Crystal Compton TR (Trial) at Page ID# 1912-18.]  In the context of the broader proof at trial, including Dr. Eason's testimony, these prescriptions are suspect.  [*See* R. 172: Martin Eason TR (Trial) at Page ID# 1505 (explaining that it is inappropriate prescribe controlled substances to family members).] Given that none of these other prescriptions are factored into the PSR's calculations, those calculations are reasonable estimates which "likely underestimate[] the quantity of drugs actually attributable to the defendant." *Anderson*, 526 F.3d at 326.   The United States will be prepared to further substantiate the drug quantity calculations at the sentencing hearing as needed.

**B.    The United States Does Not Recommend Applying the Two-Level Enhancement Under U.S.S.G. § 2D1.1(b)(12)**

Compton also objects to the PSR's inclusion of the two-level enhancement under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises for the purpose of distributing a controlled substance.  The enhancement applies to anyone who "(1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled

10

substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013).  As to the third element, "distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises."  *Id.*; *see also United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014).

The United States does not contest that Compton's clinics saw a large number of other patients whose treatment has not been analyzed in the course of the Government's investigation.  To be clear, occasionally prescribing appropriately does not mean that the enhancement is inapplicable and the United States has previously advocated for the enhancement even where portions of a defendant's business is lawful.  *See United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014) (rejecting argument that lawful activity on premises negated enhancement because "[o]ne can maintain a premises for more than one purpose").  But given the specific proof in this case and the relatively narrow focus of the Government's investigation, there is likely insufficient proof here to establish that unlawfully distributing controlled substances was "one of the defendant's primary or principal uses for the premises." *Johnson*, 737 F.3d at 447.

### C.    Lambert Is Ineligible For A Reduction Under U.S.S.G. § 3B1.2(a)

Next, Lambert objects to the omission of a four-level reduction under U.S.S.G. § 3B1.2, which "allows for a range of adjustments for defendants who are 'substantially less culpable than the average participant in the criminal activity.'" *United States v. Karas*, 793 Fed. App'x. 380, 386 (6th Cir. 2019) (citing U.S.S.G. § 3B1.2, Application Note 3).  This inquiry is "heavily dependent upon the facts of the particular case" and the Court "may consider a non-exhaustive list of factors, including the defendant's: (1) understanding of

the 'scope and structure' of the crime; (2) participation in the planning or organizing of the crime; (3) 'exercise[ ]' of decision-making authority or 'influence[ ]' over the exercise of decision-making authority; (4) acts performed and responsibility or discretion over those acts; and (5) possible benefit from the crime." *Id.* (citing U.S.S.G. § 3B1.2, Application Note 3(C)(i)-(v)).

Here, Lambert's role in the offense does not merit a reduction under U.S.S.G. § 3B1.2.  As noted, the trial evidence established that Lambert was extensively involved in Compton's activities at the clinics, including patient intake, recordkeeping, drug testing, and issuing controlled substance prescriptions.  Patients J.R., E.H., and W.M. knew Compton and Lambert socially.  All three testified at trial that they picked up prescriptions from Lambert without seeing Compton.  Six witnesses testified that they observed Lambert signing Compton's prescriptions.  Multiple witnesses testified that their communications with Compton went through Lambert, including in discussions about J.R. driving under the influence arrest(s) and in W.M.'s interactions with Lambert during his final visit to the clinic.  Pharmacist Wes Rowe recalled contacting the office about suspicious prescriptions and speaking with Lambert, who he described as being difficult.  None of this made Lambert "substantially less culpable" in the commission of the offenses.  Instead, the trial evidence indicates that Lambert had a full understanding of the scope and structure of the offenses, participated in the commission of the offenses, and exercised a significant degree of influence and decision-making when doing so.  A reduction under U.S.S.G. § 3B1.2 is not appropriate here.

12

**D.      The United States Recommends Applying the § 3B1.3  Position of Trust or Special Skill Enhancement To Both Defendants**

A two-level enhancement applies if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.  A position of trust is characterized by professional or managerial discretion, and a person occupying a position of trust ordinarily receives less supervision than an employee whose responsibilities are non-discretionary in nature.  U.S.S.G. § 3B1.3, comment (n.1).

With respect to Compton, the PSR correctly applies the § 3B1.3 enhancement. Courts have consistently applied the enhancement to physicians in similar cases, recognizing the trust placed in physicians who are authorized to prescribe controlled substances.  *See United States v. McCollister*, 96 Fed. App'x. 974, 976 (6th Cir. 2004) ("A practicing physician enjoys perhaps the highest level of discretion afforded any professional. McCollister abused a position of trust because his professional role as practicing physician made it possible for him to write prescriptions for oxycodone and thus contributed significantly to his ability to commit the offense."); *United States v. Hoffer*, 129 F.3d 1196, 1204 (11th Cir.1997) (defendant "betrayed society's trust by using his prescription writing privileges to distribute controlled substances outside the legitimate practice of medicine").  Compton does not appear to object to this enhancement.

The United States also believes the § 3B1.3 enhancement properly applies to Lambert.  Lambert objects to the enhancement.  The United States acknowledges that Lambert was an LPN who was not authorized to prescribe controlled substances on her

13

own.  But the trial evidence established that Lambert used her status as a nurse to essentially run the practices at times and regularly access (and use) Compton's prescription pad throughout the charged conspiracies.  Thus, Lambert's "special skill as a nurse made it significantly easier for her to commit the crime[s]."  *United States v. Wilson*, 345 F.3d 447, 450 (6th Cir. 2003) (cleaned up and citations omitted).  Indeed, several courts have applied the enhancement to nurses who similarly abused the access they enjoyed to controlled substances to commit offenses.  *See United States v. Stella*, 591 F.3d 23, 28 (1st Cir. 2009) (applying enhancement to registered nurse who "had unsupervised access to drugs in the locked meds cabinet and unsupervised authority to refill medications in PCA pumps" and noting that "[t]he district court correctly rejected Stella's argument that the existence of a regulatory structure for registered nurses meant she had no professional or managerial discretion . . . [because] [b]y definition, professionals are subject to regulation in their professions; those regulations largely exist because of the responsibilities and discretion vested in professionals."); *United States v. Segura*, 139 Fed.Appx. 79, 80-81 (10th Cir. 2005) (affirming application of § 3B1.3 to registered nurse who abused access to medications to take "narcotics for his own use, and replaced the stolen narcotics with either saline solution or other drugs").

The United States acknowledges that in some cases, an LPN may not enjoy sufficient autonomy or authority to qualify for the enhancement.  *See United States v. Vigil*, 998 F.Supp.2d 1121, 1152 (D.N.M. 2014) (applying enhancement to nurse practitioner who held prescribing authority, but noting that "[a] nurse employed in a doctor's office or hospital may, depending on the circumstances, be more analogous to a bank teller or a clerk

14

rather than a bank's chief executive officer . . .").  But given the specific facts of this case, the United States respectfully submits that the enhancement applies to Lambert.

### E.      The § 3C1.1 Enhancement Applies To Compton's Trial Testimony

Finally, Compton objects to the PSR's inclusion of a two-level enhancement under U.S.S.G. § 3C1.1 for obstructing justice.  The enhancement applies to a defendant who "testified falsely concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Chance*, 306 F.3d 356, 390 (6th Cir. 2002) (citations and quotations omitted).  In order to apply the enhancement, the Court "must identify those particular portions of the defendant's testimony that it considers to be perjurious, and either make specific findings as to each element of perjury or make a finding that encompasses all of the factual predicates for a finding of perjury."  *United States v. Fitzgerald*, 754 F. App'x 351, 368–69 (6th Cir. 2018). "In turn, the offense of perjury requires the establishment of three elements: that the defendant made "(1) a false statement under oath (2) concerning a material matter (3) with the willful intent to provide false testimony."  *United States v. Macias-Farias*, 706 F.3d 775, 782 (6th Cir. 2013)

Here, the PSR correctly applies two-level enhancement under U.S.S.G. § 3C1.1 in light of Compton's trial testimony.  In particular, Compton made the following perjurious statements in her testimony:

***Compton's Testimony About Lambert Signing Her Prescriptions***.   Compton testified several times on direct examination that no one else, including Lambert, signed her controlled substance prescriptions.  [*See* R. 191: Crystal Compton TR (Trial) at Page

15

ID# 1811 ("I signed all of my prescriptions. Nobody ever signed for me."); *Id*. at Page ID# 1894 ("Q. Did you ever let Kayla Lambert use or sign prescriptions for you? A. She never signed my signature."); *Id*. at Page ID# 1895 ("So, yes, she would write what's on there, but then I had the script and signed it.").  On cross-examination, Compton reiterated that she always signed her prescriptions.  [*Id*. at Page ID# 1934.]  The balance of the trial evidence, including the testimony of six witnesses who observed Lambert signing Compton's prescriptions, demonstrates the falsity of Compton's testimony.  The jury's verdict on Count 1 also necessarily rejected Compton's testimony.

Further, the United States also asked Compton about a specific incident during which office manager Pam Hamilton confronted Compton and Lambert after witnessing Lambert signing Compton's prescriptions.  [*Id*. at Page ID# 1935.]  Compton unequivocally denied that this incident occurred. [*Id*. ("Q. Okay. Isn't it true that Pam Hamilton witnessed Kayla Lambert signing your prescriptions and confronted you about it? A. That is false.").]  The United States called Ms. Hamilton as a rebuttal witness.  She confirmed that the incident occurred, directly refuting Compton's testimony.

***Compton's Testimony About "Missing" Medical Records***.  As the United States established in its case-in-chief, certain patients' medical records suggested they went long intervals without actually seeing Compton for a medical visit despite continuing to receive controlled substance prescriptions. [*See* Gov. Ex. 501.]  During her testimony, Compton attempted to blame these gaps on her medical record system or medical records which went "missing."  For instance, patient S.A.'s medical record indicates that her first visit to Compton's practice occurred in September 2017, even though she had received controlled

16

substance prescriptions since February 2017 without any documented interactions with Compton.  [Gov. Ex. 102.]  Compton attempted to excuse the absence of any earlier records by claiming that "they have gotten lost in printing or something . . . ." [R. 191: Crystal Compton TR (Trial) at Page ID# 1854 ("The notes that went with -- again, I have handwritten things, but they have gotten lost in printing or something . . .").][4] Compton's testimony, however, does not explain why the record from September 2017 states that the patient presented on that date to "establish" primary care and that the patient had "not seen anyone since pediatrician" as excerpted below:

> **CHIEF COMPLAINT 1**
> **New patient** (as reported by Patient)
> **Comment: Here to establish PCP. States "have not really seen anyone since pediatrician. Denies any significant medical history. States "car accident in January 2017 with ongoing right knee pain, neck and back pain, and**

[Gov. Ex. 102 at 34.]

On cross-examination, Compton continued to insist that certain records had gone missing, including a collection of handwritten notes from her tenure at Betsy Lane Primary Care that were allegedly placed in a box in storage but later "repossessed." [R. 191: Crystal Compton TR (Trial) at Page ID# 1928.]  As the Government established during cross-examination and during closing argument, this claim holds little water given that Compton made no mention of any missing records when responding to two grand jury subpoenas or when responding to the KBML about many of the same patients. Further, the electronic medical records in evidence contain records entries from each of the months Compton

---

[4] In the same colloquy, Compton also appeared to suggest that records were missing because the office's printer ran out of paper.  [*Id*. at Page ID# 1854 (". . .you know, we were printing and maybe it run out of paper.").]

practiced at Betsy Lane Primary Care, which calls into doubt why other records from that same time period would have been handwritten and would have gone missing.[5]

There is no dispute that the testimony outlined above was (1) given under oath; and (2) material to the case. Given the context of the testimony and that Compton repeatedly made the same false claims even after being afforded the opportunity to change her testimony, the Court can safely conclude that she made these statements with the willful intent to provide false testimony. *Macias-Farias*, 706 F.3d at 782. Accordingly, Compton's testimony above suffices to support the PSR's recommended two-level enhancement under U.S.S.G. § 3C1.1

In her sentencing memorandum, Compton "vehemently denies that she obstructed justice." [R. 192: Sentencing Memo. at 13.] But Compton does not actually refute any of the false statements identified above. *Id.* Accordingly, the Court should adopt the PSR's findings and apply the enhancement. *see United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003); *see also United States v. Adkins*, 729 F.3d 559, 570 (6th Cir. 2013).

## II.   THE UNITED STATES' SENTENCING RECOMMENDATION UNDER 18 U.S.C. § 3553(A)

As noted, the advisory U.S.S.G. range serves as the "starting point and initial

---

[5] Other aspects of Compton's testimony about her medical records are also suspect. For instance, Compton claimed she lost access to the electronic medical record system for Eastern Kentucky Medical group "just after the office closed," which would have occurred in late 2018. [*Id.* at Page ID# 1925.] Yet Compton produced records in response to the second grand jury subpoena in September 2019. [*See* Gov. Ex. 107 ("Printed on 9/24/2019").]

18

benchmark" for the Court's sentencing analysis. *Bolds*, 511 F.3d at 579-80 (citation omitted). Here, assuming the Court adopts the positions outlined above, Compton's and Lambert's adjusted offense levels are both 36, resulting in an advisory U.S.S.G. range of 188 months to 235 months for each Defendant.

The Court also considers the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1)-(2). The United States respectfully submits that although it will likely seek a sentence below the advisory U.S.S.G. range for each Defendant, these factors weigh in favor of a significant custodial sentence.

***Nature and circumstances of the offense***. As noted, the jury convicted Compton and Lambert of conspiring to unlawfully distribute controlled substances and of conspiring to unlawfully misuse Compton's DEA registration, both in violation of 21 U.S.C. § 846. Compton was also convicted of numerous counts of unlawfully prescribing controlled substances in violation of 18 U.S.C. § 841. While misusing a DEA registration and drug trafficking are serious offenses in any context, the United States respectfully submits that the criminal conduct in this case is especially problematic given the positions of trust Compton and Lambert occupied. As a licensed physician and a registrant with the Drug Enforcement Administration ("DEA"), Compton was entrusted with prescribing potentially addictive and dangerous controlled substances in a manner consistent with her training and prevailing professional standards. Lambert was also a licensed medical

19

professional who was entrusted to act appropriately with patient case, including with respect to controlled substances. Both abused the trust placed in them as medical professionals.

Further, the chronology Compton's and Lambert's conduct in relation to the underling investigation also warrant consideration. As established at trial, the DEA interviewed Compton in September 2018 and served a grand jury subpoena for medical records in November 2018. [Gov. Ex. 4a.] According to Compton, Lambert was aware of the subpoena and assisted with compiling the records in response to the subpoena. [See R. 191: Crystal Compton TR (Trial) at Page ID# 1924.] Investigators subsequently interviewed Lambert in March 2019. [Gov. Ex. 5a.] In the course of their interviews, Compton and Lambert both made claims about their conduct that proved to be untrue at trial, including, for instance, that no one else was signing Compton's prescriptions and that Compton was regularly using urine drug testing and followed a "one strike and you're out" policy regarding failed drug tests. [See Gov. Ex. 4k; Gov. Ex. 5g.] Compton then received an order from the KBML in May 2019 requesting records for an investigation and it appears both Compton and Lambert assisted in compiling information to provide the KBML in response. [Gov. Ex. 14.] Even after the DEA interviews, the November 2019 subpoena, and learning of the KBML investigation, Compton and Lambert persisted in unlawfully issuing controlled substance prescriptions until the KBML suspended Compton's license, preventing her from continuing to prescribe.

Compton's and Lambert's crimes were not harmless. As noted, a number of the patients at issue later sought treatment for opioid addiction. Several patients—W.M., J.R.,

E.H., and K.S.—testified about the role the prescriptions Compton and Lambert issued played in starting or fostering their addictions. They also described how their addictions adversely impacted their lives. A significant sentence is warranted given the nature and circumstances of the offense.

*History and characteristics of the defendant*. There is nothing about Compton's or Lambert's personal or professional histories that provide a compelling justification for the crimes they committed. Both were licensed medical professionals with the capacity to earn a living legitimately while caring for patients in accordance with medical standards. While Compton suffered from health problems throughout the relevant time period, those health conditions do not excuse the conduct that was revealed throughout the course of trial. Indeed, it appears that Compton was capable of acting as a competent, caring physician when she chose to do so. Yet in this case, she and Lambert repeatedly issued prescriptions for large quantities and combinations of dangerous drugs, sometimes with no medical rationale whatsoever and often without employing basic safeguards against abuse and diversion.

*Seriousness of the offense, respect for the law, and deterrence*. The United States respectfully submits that the seriousness of the offense, the need to promote respect for the law, and deterrence are critical factors in this case. Physicians and other medical professionals—especially those who choose to prescribe controlled substances—play a critical role in protecting against the unlawful proliferation of addictive controlled substances, especially opioid painkillers. The sentence in this case must reflect the seriousness of this crime and signal to other professionals that they will receive meaningful

21

punishment if they intentionally abandon their responsibilities under the law.

*Imposition of a fine*.  Pursuant to U.S.S.G. §5E1.2(c), the advisory fine range is $40,000 to $1,000,000.  It appears that both Compton and Lambert are unable to pay a significant fine. [Compton PSR ¶ 104; Lambert PSR ¶ 76.]

In light of the factors outlined above, the United States anticipates that it will ask for a custodial sentence and a modest fine below the U.S.S.G. range as calculated by the Court.  The undersigned will articulate the government's position in greater detail at the sentencing hearing.

<div style="margin-left:50%">

Respectfully submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

By:   s/ Andrew E. Smith
       Assistant United States Attorney
       260 W. Vine Street, Suite 300
       Lexington, Kentucky 40507-1612
       (859) 685-4849
       andrew.e.smith@usdoj.gov

</div>

## <u>CERTIFICATE OF SERVICE</u>

On February 16, 2024, I electronically filed this motion through the ECF system, which will send the notice of electronic filing to all counsel of record.

/s/ Andrew E. Smith
Assistant United States Attorney